## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## STATESBORO DIVISION

OLAUDAH MCKENZIE,

       Plaintiff,

    v.

CAPTAIN JOHN STATEN; and DR. POPE,

       Defendants.

CIVIL ACTION NO.: 6:17-cv-83

## ORDER AND MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court on Defendants John Staten and Dr. Myra Pope's Motions for Summary Judgment and Defendant Pope's Motion for Leave to File Documents Under Seal. Docs. 46, 47, 48.  For the reasons discussed below, I **GRANT** Defendant Pope's Motion for Leave to File Documents Under Seal.  Additionally, I **RECOMMEND** the Court **GRANT** each Defendant's Motion for Summary Judgment and **DISMISS** Plaintiff's Complaint.  Furthermore, I **RECOMMEND** the Court **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal and **DENY** Plaintiff *in forma pauperis* status on appeal.

## BACKGROUND

### I.    Plaintiff's Allegations and Procedural History

Plaintiff filed this action on June 20, 2017, alleging Defendants violated his civil rights by delaying necessary medical care during his incarceration at Bulloch County Jail ("BCJ"). Docs. 1, 2.  The United States Marshals arrested Plaintiff on March 23, 2015 and brought him to BCJ during the pendency of his criminal trial.  Doc. 2 at 7.  In June 2015, four inmates attacked Plaintiff; the following night, five different inmates attacked Plaintiff.  Id. at 3–4.  Plaintiff

suffered injuries to his ribs, head, face, and his left eye and was brought to the emergency room at Statesboro Regional Hospital.  Id. at 4.  There, medical professionals determined Plaintiff had two broken ribs, head trauma, and a broken left eye socket, which required emergency corrective surgery.  Id.  However, Plaintiff claims he did not receive this corrective surgery for the eye injury until November 2015.  Id. at 5.  Due to the delay, Plaintiff "had to get his orbit re-broken when he receive[d] surgery" and ultimately "lost the mobility in his left eye and is suffering from drainage from that eye," continued pain, and loss of vision.  Id.  Plaintiff claims that Defendant Pope and Jane Doe, a nurse, contributed to this delay by refusing to order surgery, despite the hospital's recommendation and exacerbated his condition by providing inadequate treatment during the four-month delay.  Id. at 7–9.  Plaintiff also contends Defendant Staten contributed to the delay by withholding permission for the corrective surgery.  Id. at 9.  Plaintiff alleges as a result of the delay in treatment he lost sight and mobility in his left eye which now produces thick white discharge, is developing into a cataract or glaucoma, and is tender to the touch. Doc. 1 at 3.

The Magistrate Judge conducted a frivolity review of Plaintiff's Complaint, and the Court dismissed several Defendants.  Doc. 8.  Plaintiff's only surviving claims are for deliberate indifference to serious medical needs against Defendants Staten and Pope.  Doc. 32.  The parties completed discovery, and on June 17, 2020, Defendants Pope and Staten filed separate Motions for Summary Judgment.  Docs. 46, 48.  In his Motion, Defendant Staten argues Plaintiff failed to exhaust his administrative remedies, Plaintiff's deliberate indifference claim fails as a matter of law, and asserts the defense of qualified immunity.  Doc. 46.  Plaintiff filed a response in opposition.  Doc. 52.  In her Motion, Defendant Pope argues Plaintiff's official-capacity claims for monetary damages should be dismissed and Plaintiff's deliberate indifference to serious

medical needs fails as a matter of law.  In response to Defendant Pope's motion for summary judgment, Plaintiff filed a statement of material facts and a response in opposition.  Docs. 53, 54.  Defendant Pope filed a reply, doc. 55, and Plaintiff filed a surreply, doc. 56.[1]  Defendant Pope also filed a Motion asking for leave to file Plaintiff's medical records under seal.  Doc. 47.  The Motions are ripe for review.

## II.    Undisputed Material Facts

Local Rule 56.1 of the Southern District of Georgia provides that a party moving for summary judgment must include "a separate, short, and concise statement of the material facts as to which it is contended there exists no genuine dispute  to be tried as well as any conclusions of law thereof."  Local R. 56.1.  Defendants each submitted Statements of Material Fact in support of their Motions for Summary Judgment, in accordance with the Federal Rule of Civil Procedure 56 and Local Rule 56.1.  Docs. 46-1, 48-1.

Defendant Pope's Statement of Material Fact ("SMF") relies on various medical records from multiple treating physicians, including Dr. Lawhorn of Statesboro Oral and Maxillofacial Surgery, Dr. Miller of Georgia Eye Institute, Dr. Bisseck of Statesboro Plastic Surgery, and Dr. Wold of Red River E.N.T. Associates.  Docs. 46-2, 46-5, 46-8, 46-9.  Defendant Pope's SMF also relies on the affidavit of Dr. Mark Beatty, who reviewed Plaintiff's medical records but did not treat Plaintiff, doc. 46-7; the affidavit of Captain Kenneth Thompson, the current Jail Administrator of BCJ, doc. 46-10; the Health Services Agreement executed between BCJ and

---

[1]     The Court **DIRECTS** the Clerk of Court to rename the following docket entries for clarity. Docket entry 53 should be renamed "Response Brief in Opposition to Defendant Pope's Motion for Summary Judgment."  Furthermore, docket entry 54 should be renamed "Plaintiff's Statement of Material Facts in Support of Brief in Response."  Docket entry 55 should be renamed "Defendant Pope's Reply to Plaintiff's Response in Opposition."  Finally, docket entry 56 should be renamed "Plaintiff's Surreply to Defendant Pope's Reply."

Southern Correctional Medicine, doc. 46-11; a "Certificate of No Records" from Southern

Correctional Medicine, doc. 46-12; and her own affidavit, doc. 46-13.

Defendant Staten's SMF cites to an affidavit of Captain Kenneth Thompson, doc. 48-3; a

copy of the Bulloch County Sheriff's Office Inmate Grievance Procedures, doc. 48-4; an audio

recording of Plaintiff making a phone call, doc. 48-5; a supplemental affidavit of Captain

Thompson regarding the audio recording, doc. 51-1; his own affidavit, doc. 48-6; a copy of

BCJ's policy and procedures regarding inmate medical records, doc. 48-7; a copy of BCJ's

qualified medical personnel, doc. 48-10; and a copy of BCJ's policy regarding non-emergency

medical services, doc. 48-11.

Plaintiff filed a Response to Defendant Pope's Motion labeled a "Statement of

Plaintiff['s] Material Facts." Doc. 54. In response to Defendant Staten's Motion for Summary

Judgment, Plaintiff filed an "Objection" which contains various citations to record evidence.

Doc. 52. The Court deems Plaintiff's Objection to Defendant Staten's Motion for Summary

Judgment compliant with Local Rule 56.1, given the liberal standard afforded pro se plaintiffs.

While these two filings, docs. 52, 54, contain citations to record evidence, the citations are all to

evidence Defendants provided in support of their Motions for Summary judgment. Plaintiff did

not submit any evidence for the Court's consideration. Indeed, Plaintiff has only submitted

signed, but unsworn, filings in this action. It is also important to note that in his responses

Plaintiff frequently makes factual allegations but provides no evidentiary support and cites to

evidence that does not support—and, at times, directly contradicts—Plaintiff's assertions.[2]

---

[2]     For instance, Plaintiff asserts in an enumeration of fact that Dr. Pope "deliberately ignored Dr. Miller['s] report," but provides no citation to any record. Doc. 54 at 7. Elsewhere, Plaintiff cites to medical records that make no mention of what he contends, e.g., "Dr. Pope deliberately ignore[d] Dr. Bisseck['s] recommended treatment plan and refuse[d] to see Plaintiff at the County Jail and or to respon[d] to any of Plaintiff['s] sick call request[s]," citing to a medical report from Statesboro

4

Additionally, Plaintiff focuses a great deal of attention on medical records that have apparently gone missing. The records in question were maintained by two private contractors—TransformHealthCS, Inc. ("Transform") and Southern Correctional Medicine ("SCM")—that provided medical services to inmates housed at BCJ during the relevant time period. Doc. 46-1 at 7. Under the controlling contracts, the medical records in question were to remain at BCJ. Id. Defendants subpoenaed Plaintiff's medical records from BCJ, which produced only two pages of records from Transform and no records from SCM relevant to Plaintiff's orbital fracture. Id. BCJ staff state they have not been able to locate any more of Plaintiff's medical records. Id. Plaintiff contends the missing records would support his claim, though he is vague about what favorable information might be contained in the records. See, e.g., Doc. 52 at 5 ("The medical file and report from the ENT is outstanding and is missing along with the SCM medical file for Plaintiff which contain vital information to show that both former Captain John Staten and Dr. Pope actions is deliberate indifference and they knowingly refuse to follow the doctor's report and instructions."). Moreover, it appears Plaintiff has not made any efforts to locate or obtain the records, aside from relying on Defendants' efforts to subpoena the documents. Plaintiff does not attempt to make a showing under Federal Rule of Civil Procedure 56(d) that he cannot

---

Regional/Plastic Surgery that says nothing about Defendant Dr. Pope. Doc. 54 at 8. Moreover, at times Plaintiff directly contradicts the record, stating, "Plaintiff was brought to Dr. Wold on November 8, 2017, upon his examination of Plaintiff Dr. Wold discovered that due to the delay between time to underwent repair in 2015, cause Plaintiff to now contracted epiphora of the eye (infection)." Doc. 54 at 11. Plaintiff cites to page 10 of Dr. Wold's records, which actually states, "It sounds like he has a epiphora secondary to lacrimal obstruction. He could have this as a result from the incision used to fix his orbital floor *it is impossible to tell.*" Doc. 46-9 at 10 (emphasis added).

present facts sufficient to justify his opposition to Defendants' Motions for Summary Judgment. Accordingly, the Court will not address the missing Transform and SCM records further.[3]

In light of these circumstances, and after reviewing the parties' submissions, the Court identifies the following undisputed, material facts for the purposes of evaluating Defendants' Motions for Summary Judgment:

Plaintiff was arrested on March 23, 2015, by United States Marshals and held in BCJ to await the outcome of his federal charges. Doc. 46-1 at 1. On June 21, 2015, Plaintiff was injured in an altercation with other inmates. Id. As a result of this altercation, Plaintiff was transported to emergency department at East Georgia Regional Medical Center (the "Hospital"). Id. The Hospital recorded that Plaintiff had an eye injury, pain, and swelling but was "negative for blurry vision, visual disturbance, and vision loss." Id. On June 22, 2015, the Hospital conducted a CT scan on Plaintiff, which revealed an orbital fracture. Id. The Hospital records state Plaintiff should follow up with a surgeon on an out-patient basis but noted "[Plaintiff] doesn't need to be admitted for emergency surgery." Id. at 2. The Hospital contacted maxillofacial surgeon, Dr. Tony Lawhorn, who agreed to see Plaintiff. Id. at 2. The Hospital discharged Plaintiff back to BCJ with a prescription for Bactrim, an antibiotic. Id. Defendant Pope ordered an antibiotic for Plaintiff at BCJ and gave him ointment and a bandage. Id.

Prior to seeing Plaintiff, Dr. Lawhorn reviewed Plaintiff's CT scan and the notes from the Hospital and decided Plaintiff's eye injury would be best treated by an oculoplastic surgeon. Id. Dr. Lawhorn conveyed his recommendation to "Sarah" (an employee at BCJ) and told her to contact either Dr. Elizabeth Miller—an ophthalmologist who specializes in oculoplastic

---

[3]     The Court is neither admonishing nor approving any party or nonparty's conduct concerning these preservation of the missing medical records. Rather, the Court simply acknowledges the records have not been obtained by the parties or presented to the Court, and, therefore, the missing records have no bearing on the instant Motions for Summary Judgment.

surgery—or a "Dr. Landa."  Id.  Sarah was unable to secure an appointment with either

recommended surgeon, so she recontacted Dr. Lawhorn, and Dr. Lawhorn set up an appointment

with Dr. Miller.  Id.

On June 26, 2015, Plaintiff saw Dr. Miller at the Georgia Eye Institute, where she wrote

in her exam notes that Plaintiff's visual acuity was normal, as was his ocular health.  Id. at 3.  Dr.

Miller recommended Plaintiff have a consult with an "[ear, nose, and throat specialist] for

evaluation of [his] medial wall fracture."  Id.  Dr. Miller's referral was not marked urgent, and

she instructed Plaintiff to return to her as needed.  Id.

Plaintiff had a consultation with Dr. Marc Bisseck, a plastic surgeon, on July 15, 2015.

Id.  In Plaintiff's medical notes, under a heading titled "focused exam," Dr. Bisseck noted

Plaintiff has "normal visual acuity" and his face was not tender to palpation.  Id.  Dr. Bisseck

also noted Plaintiff was an inmate and that further treatment would "proceed after [Plaintiff] is

approved for procedure," but Dr. Bisseck did not indicate a timeframe for further treatment.  Id.

3–4.  Plaintiff did not receive further treatment for his orbital fracture outside of BCJ until

November 2015.

On November 5, 2015, Plaintiff returned to see Dr. Bisseck, who noted Plaintiff still had

normal visual acuity and no tenderness to palpation.  Id. at 4.  Dr. Bisseck recorded that swelling

to Plaintiff's face had resolved, and Plaintiff reported he had no difficulty with blurred or double

vision.  Id.  During the visit Plaintiff claimed his eye was infected, but Dr. Bisseck's medical

records give no indication Plaintiff had an infection at the time of the examination.  Doc. 46-3 at

18.  Dr. Bisseck instructed Plaintiff to follow up for "surgical repair" in five days.  Doc. 46-1 at

4.

During a phone call on November 10, 2015, Plaintiff and another person are recorded discussing his surgery, the other participant on the call states, "That's probably why they've been held up taking you on down the road," seemingly referring to the delay in transferring Plaintiff to federal prison, and Plaintiff responds, "Probably, because this takes a specialist to do this," referring to his eye surgery and stating the "feds are going to pay for [the surgery]." Doc. 48-5 (audio recording, 4:05–4:32); Doc. 51-1.

On November 11, 2015, Plaintiff underwent a successful surgery to repair his orbital fracture and came out of surgery with intact vision. Doc. 46-1. On November 19, 2015, Plaintiff met with Dr. Bisseck for a post-surgery follow-up appointment. Id. Dr. Bisseck noted in Plaintiff's medical records Plaintiff had no difficulty with his vision, had no complaints of pain, and "denies excess tearing from eyes." Id. Dr. Bisseck also wrote Plaintiff had appropriate sensation to the left side of his face, extraocular movement in all directions, no evidence of excess tearing, and denied any blurry vision or dizziness. Id.

Nearly two years after his surgery, in September 2017, Plaintiff—while incarcerated at the Federal Correctional Institution-Pollock, in Pollock, Louisiana—sought treatment for complaints of discharge and tearing from his repaired eye. Id. at 5. Plaintiff was seen by an ophthalmologist who observed normal ocular pressure and vision. Id. The ophthalmologist diagnosed Plaintiff with epiphora (excessive tearing from the eye) and referred him to an ENT/otolaryngologist, Dr. Christian Wold, for consultation. Id.

Plaintiff saw Dr. Wold on November 8, 2017, who found Plaintiff had normal facial strength and sensation. Id. Dr. Wold diagnosed Plaintiff as having epiphora and noted, "[Plaintiff] could have [epiphora] as [a] result [of the] incision used to fix his orbital floor [but] it is impossible to tell." Id. In January 2018, Plaintiff had a dacryocystectomy procedure to

remove obstructions to his tear gland and allow his eye to drain tears.  Id.  Following the procedure, Plaintiff was examined by Dr. Wold, who wrote that "[Plaintiff] states he is not having any problems," and "things look excellent."  Id.  Plaintiff was examined by Dr. Wold again in March 2018, where Dr. Wold noted that Plaintiff had normal facial strength, no scarring, and his left eye was "normal."  Id. at 6.  It appears from the record that the January 2018 largely resolved Plaintiff's eye-related issues, though Plaintiff contends he needs to wear glasses due to the injury and procedures.

As noted above, Plaintiff asserts deliberate indifference claims against Defendants Pope and Staten regarding the delay Plaintiff claims to have experienced in receiving the November 11, 2015 surgery by Dr. Bisseck.  Defendant Pope does not recall her interactions with Plaintiff. Id. at 10.  Defendant Pope maintains that, when another physician recommended surgery or she determined in her medical judgment that an inmate required surgery, she had a routine practice of promptly requesting an off-site surgical appointment.  Id.  Defendant Pope also contends, had she been aware of Plaintiff's need for surgery, she would have ordered it.  Id.  Defendant Pope says that once she orders surgery, BCJ and nursing staff are responsible for seeking approval for the surgery and getting it scheduled.  Id.  Further, Defendant Pope states that surgery for federal inmates, like Plaintiff, must be approved by the federal prison system, and she is not the person within BCJ who coordinates with the federal prison system.  Id.

Defendant Staten states he was unaware of Plaintiff's "special medical condition" during the time in 2015 that Plaintiff was awaiting surgery and was unaware of any recommendations made by medical staff at BCJ related to Plaintiff's treatment.  Doc. 48-1 at 3.  In fact, the Agreement between BCJ and Transform provided that medical records would be kept confidential and "separate from the detainee's confinement record."  Id.  Defendant Staten's

involvement in BCJ's medical care is limited to instructing BCJ employees to make inmates available for medical appointments.  Id. at 4.  He attests he had no role in determining when an inmate would receive medical treatment and did not direct any individual to deny or delay medical treatment to any inmate.  Id.

## LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  However, there must exist a conflict in substantial evidence to pose a jury question."  Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)).  "If the evidence [produced by the nonmoving party] is merely colorable or is not significantly probative summary judgment must be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 at 249 (1986) (citations omitted).

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law.  See Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to

prove his case at trial.  See id. (citing Celotex v. Catrett, 477 U.S. 317, 322–23 (1986)).  In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011).

## DISCUSSION

**I.      Motion for Leave to File Documents Under Seal**

Defendant Pope requests leave to file Plaintiff's confidential medical records under seal, which have been attached as exhibits to her Motion for Summary Judgment.  Doc. 47.  Plaintiff does not oppose the Motion.  For the reasons and in the manner set forth below, the Court **GRANTS** Defendant's Motion.

The right of access to judicial records pursuant to common law is well-established.  See Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978); see also Brown v. Advantage Eng'g, Inc., 960 F.2d 1013, 1016 (11th Cir. 1992).  This right extends to the inspection and the copying of court records and documents.  See Nixon, 435 U.S. at 597.  The right to access, however, is not absolute.  See Globe Newspaper Co. v. Superior Court for Norfolk County, 457 U.S. 596, 598 (1982).  When deciding whether to grant a party's motion to seal, the court is required to balance the historical presumption of access against any significant interests raised by the party seeking to file under seal.  See Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1311 (11th Cir. 2001); Newman v. Graddick, 696 F.2d 796, 803 (11th Cir. 1983).  In balancing the interests, courts consider, among other things:

> whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the

information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents.

Romero v. Drummond Co., Inc., 480 F.3d 1234, 1246 (11th Cir. 2005). Additionally, "[a] party's privacy or proprietary interest in information sometimes overcomes the interest of the public in accessing the information." Id. (citing Nixon, 435 U.S. at 598). This Court's Local Rule 79.7 sets forth procedures for a party to request that documents be filed under seal. Defendant asserts a grant of leave would protect confidentiality of Plaintiff's medical records. Defendant has shown good cause for requesting leave to file under seal documents relating to Plaintiff's medical records. Accordingly, the Court **GRANTS** Defendant's unopposed Motion, doc. 47, and **DIRECTS** the Clerk to **FILE UNDER SEAL** Plaintiff's medical records, which are referenced at Docket Numbers 46-3 ("Statesboro Plastic Surgery Records"); 46-5 ("Lawhorn MD Records"); 46-8 ("St. Francis Cabrini Records"); and 46-9 ("Red River Records"). These documents shall remain under seal permanently.

## II.    Motions for Summary Judgment

Defendants argue separately in favor of summary judgment on Plaintiff's deliberate indifference to serious medical needs claim based on the delay in receiving eye surgery. Defendant Pope argues Plaintiff has not demonstrated he had a serious medical need, cannot demonstrate causation between the timing of his 2015 surgery and any damages, and cannot prove she had the requisite culpability to establish deliberate indifference. Doc. 46-2 at 11–22. Defendant Pope also argues for summary judgment on claims against her in her official capacity. Doc. 46-2 at 9. Defendant Staten argues he had no subjective knowledge of a risk of serious harm to Plaintiff and, thus, could not have been deliberately indifferent. Doc. 48-2 at 10–13. Defendant Staten also argues he is entitled to qualified immunity and that Plaintiff failed to exhaust his administrative remedies. Id. at 4, 13.

In response, Plaintiff broadly recounts his treatment history, questions the loss of the medical records, and advances unsupported and conclusory allegations that Defendants ignored Dr. Bisseck's treatment plan, which delayed him from receiving orbital surgery and ultimately resulted in two days in the hospital because the doctor had to re-fracture Plaintiff's orbital wall "to retrieve [sic] the trapped muscle."  Doc. 52 at 9; Doc. 53 at 9.  Moreover, he asserts in the months following his surgery, he developed an infection causing his eye to drain pus.  Doc. 53 at 10.

### A.     Official Capacity Claims for Monetary Damages

In his original Complaint, Plaintiff asserted his deliberate indifference claim against all Defendants in their individual and official capacities.  Doc. 2 at 2–3.  In the February 5, 2018 Report and Recommendation, the Magistrate Judge only recommended dismissal of the official capacity claims against Defendant Staten.  Doc. 8 at 6–7.  The District Judge adopted the Magistrate Judge's recommendation.  Doc. 13.  Therefore, Plaintiff's claims against Defendant Pope in her official capacity, as well as her individual capacity, remain.  Defendant Pope argues she is entitled to summary judgment on Plaintiff's claims against her in her official capacity.  Doc. 46-2 at 9–10.  Plaintiff did not respond to this argument.

Defendant Pope is an employee of Transform, BCJ's contracted healthcare contractor. "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978)); see also Christman v. Saint Lucie County, 509 F. App'x 878, 879 (11th Cir. 2013) ("For purposes of a suit under 42 U.S.C. § 1983, a claim against a defendant in his official capacity is the same as a claim against his employer.").  "[A]n official-capacity suit is, in all respects other than name, to

be treated as a suit against the entity." <u>Graham</u>, 473 U.S. at 166.  "[I]n an official-capacity action . . . [an] entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation [of a federal right] . . . thus, in an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law."  <u>Id.</u>  "[T]o impose § 1983 liability on a [entity], a plaintiff must show: (1) that his constitutional rights were violated; (2) that the [entity] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004).

Plaintiff's Eighth Amendment official capacity claim against Defendant Pope is, in effect, a claim against Transform.  Plaintiff, however, does not allege Transform had a custom or policy that caused a violation of his constitutional rights.  Indeed, the Magistrate Judge recommended dismissal of Plaintiff's claims against Transform, in part based on Plaintiff's failure to allege an improper custom or policy.  Doc. 8 at 6.  Because Plaintiff fails to identify any custom or policy that led to a violation of his constitutional rights, Defendant Pope's Motion for Summary Judgment on Plaintiff's official capacity claim against her should be granted.

## B.      Exhaustion of Administrative Remedies

Defendant Staten argues Plaintiff failed to exhaust his administrative remedies related to his deliberate indifference claim, and, therefore, he is entitled to summary judgment on the claim.  Plaintiff obliquely responds to Defendant Staten's argument by referencing grievances he purportedly filed at various points in his briefs.

In the Eleventh Circuit, exhaustion of administrative remedies is a matter in abatement that generally does not address the merits of the case.  <u>Bryant v. Rich</u>, 530 F.3d 1368, 1374 (11th Cir. 2008); <u>see also</u> <u>Turner v. Burnside</u>, 541 F.3d 1077, 1082 (11th Cir. 2008) (The first

step of <u>Turner</u> "is analogous to judgment on the pleadings under Federal Rule of Civil Procedure 12(c).")  Thus, the exhaustion defense "is not ordinarily the proper subject for a summary judgment" but instead "should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." <u>Id.</u> at 1374–75.  Because the defendant must raise exhaustion in a motion to dismiss, the Eleventh Circuit treats failure to exhaust as an unenumerated defense pursuant to Federal Rule of Civil Procedure 12(b).  <u>Id.</u> at 1375 (holding "exhaustion should be decided on a Rule 12(b) motion to dismiss" even though "motions to dismiss for failure to exhaust are not expressly mentioned in Rule 12(b)").  For this reason, I construe this portion of Defendant Staten's Motion for Summary Judgment as a Rule 12(b) motion to dismiss for failure to exhaust administrative remedies.

### 1.   PLRA's exhaustion requirement.

Under the Prison Litigation Reform Act ("PLRA"), an incarcerated individual must properly exhaust all available administrative remedies—the prison's internal grievance procedures—before filing a federal lawsuit to challenge prison conditions.  42 U.S.C. § 1997e(c)(1); <u>see</u> <u>Jones v. Bock</u>, 549 U.S. 199, 202 (2007); <u>Harris v. Garner</u>, 216 F.3d 970, 974 (11th Cir. 2000).  The purpose of the PLRA's exhaustion requirement is to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  <u>Whatley v. Warden, Ware State Prison</u> (<u>Whatley I</u>), 802 F.3d 1205, 1208 (11th Cir. 2015) (quoting <u>Woodford v. Ngo</u>, 548 U.S. 81, 93 (2006)).

Proper exhaustion is mandatory, and courts have no discretion to waive it or excuse it based on improper or imperfect attempts to exhaust, no matter how sympathetic the case or how special the circumstances.  <u>Ross v. Blake</u>, 136 S. Ct. 1850, 1857 (2016) (finding that the PLRA requires exhaustion "irrespective of any 'special circumstances'" and its "mandatory language

means a court may not excuse a failure to exhaust, even to take such circumstances into account"); Jones, 549 U.S. at 211 ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.").  Moreover, courts may not consider the adequacy or futility of the administrative remedies afforded to the inmate. Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000) (noting that an inmate's belief that administrative procedures are futile or needless does not excuse the exhaustion requirement). Rather, courts may only determine whether administrative remedies are available and whether the inmate properly exhausted these remedies prior to bringing his federal claim.  Id.

Proper exhaustion requires compliance with the prison's administrative policies, deadlines, and other critical procedural rules.  Woodford, 548 U.S. at 91–92; Bryant v. Rich, 530 F.3d 1368, 1378 (11th Cir. 2008) ("To exhaust administrative remedies in accordance with the PLRA, prisoners must 'properly take each step within the administrative process.'" (quoting Johnson v. Meadows, 418 F.3d 1152, 1157 (11th Cir. 2005))).  "[A]n inmate alleging harm suffered from prison conditions must file a grievance and exhaust the remedies available under that procedure *before* pursuing a § 1983 lawsuit."  Smith v. Terry, 491 F. App'x 81, 83 (11th Cir. 2012) (emphasis retained) (quoting Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000)); Gooch v. Tremble, No. 1:18-cv-058, 2018 WL 2248750, at *3 (S.D. Ga. Apr. 20, 2018) ("[B]ecause exhaustion of administrative remedies is a 'precondition' to filing an action in federal court, Plaintiff had to complete the entire administrative grievance procedure *before* initiating this suit." (emphasis retained) (quoting Higginbottom, 223 F.3d at 1261)).  An incarcerated individual cannot "cure" an exhaustion defect by properly exhausting all remedies after filing suit.  Terry, 491 F. App'x at 83; Harris, 216 F.3d at 974.

Moreover, to properly exhaust, prisoners must do more than simply initiate grievances; they must also appeal any denial of relief through all levels of review that comprise the administrative grievance process.  Bryant, 530 F.3d at 1378; see also Okpala v. Drew, 248 F. App'x 72, 73 (11th Cir. 2003) (affirming sua sponte dismissal for failure to exhaust when a federal inmate submitted a written complaint and appealed the decision but filed his lawsuit before receiving the final decision on his appeal); Sewell v. Ramsey, No. CV406-159, 2007 WL 201269 (S.D. Ga. Jan. 27, 2007) (finding that a plaintiff who is still awaiting a response from the warden regarding his grievance is still in the process of exhausting his administrative remedies).

The procedural steps prisoners must follow to fully exhaust are set out by their prison's administrative grievance policies.  Jones, 549 U.S. at 218; Bracero v. Sec'y, Fla. Dep't of Corr., No. 17-14278, 2018 WL 3861351, at *1 (11th Cir. Aug. 14, 2018) ("To satisfy the exhaustion requirement, a prisoner must complete the administrative process in accordance with the applicable grievance procedures established by the prison.").  Proper exhaustion requires prisoners do more than simply initiate a grievance; they must correctly follow all procedural rules set out in the institution's policy—including time limits—and must appeal any denial of relief through all levels of review that comprise the agency's administrative grievance process. Johnson, 418 F.3d at 1159 ("Prisoners must timely meet the deadlines or the good cause standard of Georgia's administrative grievance procedures before filing a federal claim."); Sewell, 2007 WL 201269 (finding that a plaintiff who is still awaiting a response from the warden regarding his grievance is still in the process of exhausting his administrative remedies).

### 2.    *Bulloch County Jail's administrative grievance policy.*

Based on the affidavit of Captain Kenneth Thompson, the Jail Administrator, if an inmate alleges a violation of his civil rights, the inmate is referred to BCJ's formal grievance system.

Doc. 48-3 at 1.  Upon referral, the inmate may file a written grievance within five days.  Id.
According to BCJ's Inmate Grievance Procedures, inmate grievance forms may be obtained on
request from the officer supervising the inmate's housing unit.  Doc. 48-4 at 2.  The grievance
shall fully state the time, date, names of facility staff and inmates involved, witnesses, and a
narrative of the incident.  Id.  Upon receipt of a grievance, the officer will log the complaint in
the BCJ logbook and acknowledge receipt of the grievance.  Id.  The Jail Administrator must
order an investigation of the incident beginning within 24 hours of receipt of the grievance.  Id.
Furthermore, an impartial staff member is appointed as a hearing officer to investigate the
grievance and submit a written report of his findings and recommendation to the Jail
Administrator within 15 days of receiving the original grievance.  Id.  The written response is to
include the investigation findings, reasons for the findings, and action taken.  Id.  Upon receiving
a formal response to his grievance, the inmate has three days to accept the findings and
acknowledge such findings by signature or appeal to the Jail Administrator.  Id.

### 3.    *Standard of review for exhaustion.*

Failure to exhaust administrative remedies is an affirmative defense, and inmates are not
required to specially plead or demonstrate exhaustion in their complaint.  Jones, 549 U.S. at 216;
Pearson v. Taylor, 665 F. App'x 858, 867 (11th Cir. 2016); Whatley I, 802 F.3d at 1209.  "In
response to a prisoner lawsuit, defendants may file a motion to dismiss and raise as a defense the
prisoner's failure to exhaust administrative remedies."  Pearson, 665 F. App'x at 867.
Additionally, "[w]hen ruling on a motion to dismiss for failure to exhaust administrative
remedies, the court may consider evidence outside the pleadings."  White v. Berger, 709
F. App'x 532, 541 n.4 (11th Cir. 2017) (citing Bryant, 530 F.3d at 1376); Glenn v. Smith, 706
F. App'x 561, 563–64 (11th Cir. 2017); Singleton v. Dep't of Corr., 323 F. App'x 783, 785

(11th Cir. 2009) ("A district court may properly consider facts outside of the pleadings to resolve a factual dispute regarding exhaustion where the factual dispute does not decide the merits and the parties have a sufficient opportunity to develop the record." (citing Bryant, 530 F.3d at 1376)).

In Turner v. Burnside, the Eleventh Circuit laid out a two-part test for resolving motions to dismiss for failure to exhaust administrative remedies under § 1997e(a). 541 F.3d at 1080–82. First, courts "look[] to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true." Id.; see also Bracero, 2018 WL 3861351, at *1. This prong of the Turner test ensures there is a genuine dispute of material fact regarding the inmate-plaintiff's failure to exhaust. Glenn, 706 F. App'x at 563–64 (citing Turner, 541 F.3d at 1082); Pavao v. Sims, 679 F. App'x 819, 824 (11th Cir. 2017). "The court should dismiss [the action] if the facts as stated by the prisoner show a failure to exhaust." Abram v. Leu, No. 17-12319, 2019 WL 76849, at *2 (11th Cir. Jan. 2, 2019) (quoting Whatley I, 802 F.3d at 1209)); Turner, 541 F.3d at 1082.

"If the complaint is not subject to dismissal at the first step, where the plaintiff's allegations are assumed to be true, the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion." Turner, 541 F.3d at 1082; see also Glenn, 706 F. App'x at 563–64; Pearson, 665 F. App'x at 867 ("At the second step, the court [is] permitted to make factual findings to resolve the issue of exhaustion."). After resolving the factual disputes, the court then decides whether, "based on those findings, defendants have shown a failure to exhaust." Bracero, 2018 WL 3861351, at *1 (quoting Whatley I, 802 F.3d at 1209).

### 4.     *Applying the <u>Turner</u> test.*

Defendant Staten argues Plaintiff filed no grievances related to his medical treatment during Plaintiff's detention at BCJ from March 2015 through November 2015 and relies on the BCJ grievance policy and the affidavit of Kenneth Thompson, Jail Administrator.  Doc. 48-2 at 4–8.  Mr. Thompson testifies that BCJ has no records of any such grievance.[4]  Doc. 48-3. Defendant Staten further argues that, even if Plaintiff did file a grievance, Plaintiff failed to exhaust the administrative remedies process because—by Plaintiff's own admission—he failed to appeal any ruling on the grievance.  Plaintiff does not respond directly to Defendant Staten's arguments but mentions he filed grievances in his various filings responsive to Defendants' Motions for Summary Judgment.

At step one under <u>Turner</u>, the Court must consider the "factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true."  <u>Turner</u>, 541 F.3d at 1080–82.  Plaintiff's allegations and Defendant Staten's allegations plainly conflict.  Plaintiff contends he filed grievance(s); Defendant Staten contends he did not.  Therefore, the Court must take Plaintiff's version of the facts as true and determine whether, under those facts, Plaintiff properly exhausted his administrative remedies.  To give Plaintiff the full benefit of this approach, the Court considers Plaintiff's factual allegations concerning exhaustion in his Complaint (and supporting "Brief"), docs. 1, 2, as well as the four filings Plaintiff has submitted in response to Defendants' Motions for Summary Judgment, docs. 52, 53, 54, 56.  In those filings, Plaintiff contends he filed one or more grievances concerning his medical treatment while he was housed at BCJ between March

---

[4]     Although Plaintiff complains about the loss of his medical records, there is no indication their loss, and the departure of Transform, affected BCJ's grievance records.  Transform and SCM dealt only with medical records.  Doc. 48-11.  BCJ's Grievance Procedure lays out a separate recordkeeping system involving a log book maintaining all formal and informal grievance forms.  Doc. 48-4.

2015 and November 2015.  However, Plaintiff contends that he was "never given an answer" to his grievance and that he was transferred to the Bureau of Prisons ("BOP") to serve his federal sentence before he received a response.  Doc. 1 at 2.  Regarding any appeal of that grievance, Plaintiff restates that he was transferred to BOP before he received a response.  In his Motion, Defendant Staten argues Plaintiff's transfer to BOP did not absolve Plaintiff from needing to continue to pursue the administrative remedies process and cites authority supporting that position.  Doc. 48-2.  Thus, Plaintiff was prompted to make any factual allegations regarding his efforts to exhaust his administrative remedies following his transfer to BOP.  Plaintiff made no such allegations and instead reiterated that he filed one or more grievances at BCJ and was transferred to BOP before receiving a response.  Doc. 52 at 6; Doc. 54 at 7.

Taking Plaintiff's version of the facts as true, Plaintiff did not exhaust his administrative remedies.  Plaintiff failed to follow-up on his grievance following his transfer to BOP and failed to pursue any appeal of the response to his purported grievance, and his transfer to BOP did not absolve him of his obligation to exhaust the administrative remedies process.  See Bryant, 530 F.3d at 1379 (finding plaintiff failed to exhaust an available administrative remedy because plaintiff, after transfer to other prison, did not file out-of-time grievance and show good cause for its untimeliness); Chatham v. Adcock, No. 3:05-cv-127, 2007 WL 2904117, at *14 (N.D. Ga. Sept. 28, 2007); Smith v. LeBlanc, 1:07-cv-124, 2011 WL 854809, at *5 (M.D. Ga. Feb. 15, 2011), report and recommendation adopted, Smith v. LeBlanc, 1:07-cv-124, 2011 WL 837166, at *1 (M.D. Ga. Mar. 8, 2011).   I, therefore, conclude Plaintiff failed to exhaust his administrative remedies under Turner step one.

Even if I were to find Plaintiff demonstrated exhaustion under Turner step one, I would conclude Plaintiff failed to exhaust at step two.  At step two, the Court must "make specific

findings in order to resolve the disputed factual issues related to exhaustion." <u>Turner</u>, 541 F.3d at 1082.  Here, I find Plaintiff has not demonstrated that he filed any grievances related to his medical treatment at BCJ.  Defendant Staten contends Plaintiff filed no such grievances and bolsters that argument with sworn testimony from the current Jail Administrator that BCJ has no record of any such grievances.  In response, Plaintiff makes various inconsistent statements about whether he filed one or more grievances, when he filed such grievances, and the content of those grievances.  For example, Plaintiff alleges in his initial Complaint that he filed one grievance but later states that he filed a grievance against Defendant Pope sometime just before July 15, 2015 (that prompted his first visit to Dr. Bisseck), and a second grievance against Defendant Staten just before November 5, 2015 (that prompted his second visit to Dr. Bisseck).  Doc. 2 at 2; Doc. 54 at 7; Doc. 52 at 6.  Plaintiff also appears to lump together all of his purported sick call requests, informal grievances, and formal grievances.  The ambiguities and inconsistencies in Plaintiff's factual allegations about his efforts to pursue administrative remedies undermine his claim that he properly exhausted his administrative remedies.  Furthermore, even if the Court were to resolve these facts concerning Plaintiff's initial grievances in his favor, the undisputed facts are still that Plaintiff made no effort to follow up on any grievance or appeal the response to any grievance.  Thus, I conclude Plaintiff failed to exhaust his administrative remedies under <u>Turner</u> step two as well.

Accordingly, I **RECOMMEND** the Court **DISMISS** Plaintiff's deliberate indifference claim against Defendant Staten.[5]

---

[5]     Plaintiff's failure to exhaust his administrative remedies warrants dismissal of his claim against both Defendant Staten and Defendant Pope, given that I have concluded Plaintiff filed no grievances related to his medical care.  However, Defendant Pope did not seek dismissal or summary judgment on the basis of exhaustion of administrative remedies.  Therefore, I proceed to address Defendants' arguments seeking summary judgment based on Plaintiff's inability to produce any admissible evidence supporting his deliberate indifference claim.

### C.    Deliberate Indifference Claims

Both Defendants contend the undisputed material facts warrant summary judgment in their favor on Plaintiff's deliberate indifference claims.  Docs. 46-2, 48-2.  Defendant Pope contends materials in the record demonstrate Plaintiff did not have a serious medical need during the relevant time period and, to the extent he did, Plaintiff cannot produce admissible evidence showing Defendant Pope acted deliberately indifferent to Plaintiff's medical need or that such purported indifference caused Plaintiff any harm.  Similarly, Defendant Staten argues the materials in the record do not establish Defendant Staten acted deliberately indifferent to Plaintiff's medical needs and Plaintiff cannot produce admissible evidence to support the contention.[6]

#### 1.    *Legal standard.*

The cruel and unusual punishment standard of the Eighth Amendment requires prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994).  In the medical care context, the standard for cruel and unusual punishment, embodied in the principles expressed in Estelle v. Gamble, 429 U.S. 97, 104 (1976), is whether a prison official exhibits a deliberate indifference to the serious medical needs of an inmate.  Farmer, 511 U.S. at 828; see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306 (11th Cir. 2009) (explaining that a pre-trial detainee's "rights exist under the due process clause of the Fourteenth Amendment" but "are subject to the same scrutiny as if they had been brought as deliberate indifference claims under the Eighth Amendment").  However, "not every

---

[6]    Defendant Staten also argues he is entitled to qualified immunity.  Because I conclude the materials in the record do not establish Defendant Staten acted deliberately indifferent to Plaintiff's medical needs and that Plaintiff has not produced any admissible evidence to support that contention, I recommend the Court grant Defendant Staten summary judgment on this claim on these grounds, and I decline to address Defendant Staten's qualified immunity argument.

claim by a prisoner that he has not received adequate medical treatment states a violation of the

Eighth Amendment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting Estelle,

429 U.S. at 105).  Rather, "a prisoner must allege acts or omissions sufficiently harmful to

evidence deliberate indifference to serious medical needs." Ross v. Corizon Med. Servs., 700 F.

App'x 914, 916 (11th Cir. 2017) (quoting Estelle, 429 U.S. at 106).

Thus, in order to prove a deliberate indifference to medical care claim, a prisoner must:

(1) "satisfy the objective component by showing that [he] had a serious medical need";

(2) "satisfy the subjective component by showing that the prison official acted with deliberate

indifference to [his] serious medical need"; and (3) "show that the injury was caused by the

defendant's wrongful conduct." Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007).

As to the first component, a medical need is serious if it "has been diagnosed by a physician as

mandating treatment or [is] one that is so obvious that even a lay person would easily recognize

the necessity for a doctor's attention." Id.  In either situation, the medical need must be "one

that, if left unattended, 'poses a substantial risk of serious harm.'" Farrow v. West, 320 F.3d

1235, 1246 (quoting Farmer, 511 U.S. at 834).

Under the second, subjective component, the Eleventh Circuit has consistently required

that "a defendant know of and disregard an excessive risk to an inmate's health and safety."

Haney v. City of Cumming, 69 F.3d 1098, 1102 (11th Cir. 1995).  Thus, the subjective

component requires an inmate to prove: "(1) subjective knowledge of a risk of serious harm;

(2) disregard of that risk; (3) by conduct that is more than mere negligence." Melton v. Abston,

841 F.3d 1207, 1223 (11th Cir. 2016).  "Conduct that is more than mere negligence includes:

(1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of

24

treatment; and (3) medical care that is so cursory as to amount to no treatment at all." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011).

In the medical context, deliberate indifference may arise from both disputes about the quality of the medical treatment and from prolonged delays in providing medical treatment. "When the claim turns on the quality of the treatment provided, there is no constitutional violation as long as the medical care provided to the inmate is 'minimally adequate.'" Blanchard v. White Cty. Det. Ctr. Staff, 262 F. App'x 959, 964 (11th Cir. 2008) (quoting Harris, 941 F.2d at 1504). "Deliberate indifference is not established where an inmate received care but desired different modes of treatment." Id.; Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985). Rather, a plaintiff must show more than "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment" in order to support a claim of deliberate indifference. Melton, 841 F.3d at 1224 (quoting Harris, 941 F.2d at 1505).

In instances where a deliberate indifference claim turns on a delay in treatment rather than the type of medical care received, the Court considers: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." Goebert, 510 F.3d at 1327; Farrow v. West, 320 F.3d 1235, 1246 (11th Cir. 2003); McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) ("Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours. . . ."). However, "[s]ome delay in rendering medical treatment may be tolerable depending on the nature of the medical need and the reason for the delay." Adams v. Poag, 61 F.3d 1537, 1544 (11th Cir. 1995) (citing Harris v. Coweta County, 21 F.3d 388, 393–94 (11th Cir. 1994)).

"A prisoner bringing a deliberate-indifference claim has a steep hill to climb." Keohane v. Fla. Dep't of Corr. Sec'y, 952 F.3d 1257, 1266 (11th Cir. 2020). The Eleventh Circuit has held, for instance, that the Constitution does not require that the medical care provided to prisoners be "perfect, the best obtainable, or even very good." Harris v. Thigpen, 941 F.2d 1495, 1510 (11th Cir. 1991) (quotation omitted). Rather, "[m]edical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Id. at 1505 (quotation omitted). The Eleventh Circuit has also emphasized that "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment." Id.

Ultimately, to survive Defendants' Motions for Summary Judgment, Plaintiff must point to some admissible evidence showing: (1) Plaintiff had an objectively serious medical need, (2) Defendants Staten and Pope acted with deliberate indifference to that need, and (3) Plaintiff's injury was caused by Defendant Staten's and Defendant Pope's wrongful conduct. See Goebert, 510 F.3d at 1326.

## 2.    *Whether Defendants are entitled to summary judgment.*

Defendants contend the materials in the record demonstrate that Plaintiff did not have a serious medical need during the relevant time period and, to the extent he did, Plaintiff cannot produce admissible evidence showing Defendants acted deliberately indifferent to Plaintiff's medical need or that such purported indifference caused Plaintiff any harm.

It is important to note Plaintiff's claims for deliberate indifference concern only whether Defendants were deliberately indifferent to Plaintiff's orbital fracture by delaying or denying Plaintiff's access to surgery for that condition until November 11, 2015. As a practical matter,

Plaintiff's claims can only relate to delay between July 15, 2015 (when Dr. Bisseck issued a plan

for Plaintiff's surgery) and November 5, 2015 (when Plaintiff returned to see Dr. Bisseck, and

she performed a pre-surgery consultation for the surgery).[7]  Indeed, Plaintiff received care from

two doctors (Drs. Lawhorn and Miller) in short succession prior to July 15, 2015, and surgery

was not formally advised until July 15, 2015.  Additionally, Plaintiff cannot plausibly assert a

claim for deliberate indifference against these Defendants related to conduct after November 5,

2015, given that he saw Dr. Bisseck on that date and was promptly scheduled for surgery, which

occurred within one week.  To be sure, Plaintiff alleges many facts concerning events after

November 5, 2015, but these allegations all concern manifestations of harm he allegedly suffered

caused by the delay between July 15, 2015 and November 5, 2015.[8]

     The Court assumes, without deciding, that Plaintiff's orbital fracture constitutes a serious

medical need.[9]  Even assuming such, Defendants argue no evidence shows they were

---

[7]    Plaintiff largely agrees. Doc. 53 at 30 (stating Defendant Pope caused a delay to "happen for three to four months (July 15, 2015–November 11, 2015)").

[8]    For example, Plaintiff contends at various points he suffered "serious medical needs" in the form of decreased visual acuity, increased risk of glaucoma and cataracts, ephiphora, and dacrocytosis, but these are all symptoms that allegedly manifested long after the November 11, 2015 surgery.  These symptoms are not relevant to determining the "serious medical need" Defendants were allegedly indifferent to between July 15, 2015 and November 5, 2015.

[9]    A condition constitutes a serious medical need if, among other things, it is a condition that "has been diagnosed by a physician as mandating treatment . . ." Goebert, 510 F.3d at 1327.  Dr. Bisseck diagnosed Plaintiff's orbital fracture on July 15, 2015.  The July 15, 2015 medical record supports the need for surgery and demonstrates that surgery would be performed.  Therefore, the orbital fracture likely constitutes a serious medical need for the purposes of Plaintiff's deliberate indifference claim. Cf. McCroan v. Morgan, No. 4:14-cv-40, 2014 WL 6453598, at *3 (N.D. Fla. Nov. 16, 2014) (noting a serious medical need is "one that has been diagnosed by a physician as mandating treatment," and denying defendant's Rule 12(b)(6) motion to dismiss because plaintiff alleged "facts showing a medical condition which has lasted for a significant period of time, and a recommendation by a medical professional for surgery").  However, because Defendants are entitled to summary judgment on other grounds, the Court declines to decide, at this time, whether the orbital fracture constitutes a serious medical need.

Case 6:17-cv-00083-RSB-BWC   Document 59   Filed 09/03/20   Page 28 of 34


deliberately indifferent to Plaintiff's need by delaying or denying surgery to correct his injury and, thus, Plaintiff cannot prove the subjective element of deliberate indifference.  Defendant Staten, who was the Jail Administrator during the relevant period, argues there is no evidence he possessed information about Plaintiff's orbital fracture and asserts he was not aware of any prescribed treatment or of specific recommendations by BCJ's medical providers.  Doc. 48-2 at 11.  Defendant Staten swears as such in an affidavit.  Doc. 48-6 at 1–2.  As further support, Defendant Staten refers to the Health Services Agreement between BCJ and Transform, which provides medical records shall be kept confidential and "separate from the detainee's confinement record."  Doc. 46-11 at 8.  Defendant Staten also states he deferred to medical staff respecting inmate's medical treatment and that, in his position, he did not determine when an inmate would receive medical treatment.  Doc. 48-6 at 2.

Defendant Pope argues Plaintiff never alleges he complained to her directly about his condition, only that she prescribed him antibiotics.  Doc. 46-2 at 20.  She does not remember Plaintiff, but it was her habit to promptly request off-site appointments and surgery for inmates if surgery had been recommended by another physician.  Doc. 46-13 at 4–5.  Further, she says once she requested an off-site appointment or surgery, it was the responsibility of the nursing or jail staff to seek approval from the federal system and, once approved, it was a nursing or jail staff member's responsibility to schedule the inmate's appointment.  Id.  Thus, Defendant Pope had no control over the timing of an inmate's off-site surgery.  Id.

Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact "subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Farmer, 511 U.S. at 842.

Defendants argue their roles were not as Plaintiff alleges and they had no control over when Plaintiff's surgery could be scheduled.  In response, Plaintiff provides no evidence to contradict Defendants' lack of subjective awareness of his medical needs.  The Court again notes Plaintiff's response is solely based on unsupported, conclusory allegations.

Furthermore, in cases that turn on the delay in providing medical care, rather than the type of medical care provided, the Eleventh Circuit has set out additional factors to guide courts' analysis, including: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay.  Goebert, 510 F.3d at 1327.  Although Plaintiff's orbital fracture was serious enough for surgical intervention, his condition was not life threatening or even urgent.  Dr. Bisseck's assessment indicated no urgency: "Patient is an inmate in a correctional facility and we will proceed after patient is approved for procedure."  Doc. 46-3 at 16.  Indeed, Dr. Bisseck did not set a timeline for surgery.  Id.  Defendant Pope's expert, Dr. Beatty, opines Plaintiff's orbital fracture was a "fairly common injury," it was "not life-threatening," and "did not pose a serious risk of blindness or severe visual impairment." Doc. 46-7 at 5.  In fact, Dr. Beatty characterizes the surgical repair of an orbital fracture as "not 'emergent'" and notes "many surgeons choose to delay the surgery at least until inflammation and swelling has decreased."  Id.  No medical evidence shows the four-month wait for surgery worsened the condition of Plaintiff's orbital fracture.  During the November 5, 2015 visit, prior to surgery, Dr. Bisseck notes Plaintiff self-reports pain and blurred double vision, yet examination reveals Plaintiff's face was not tender to palpation, his swelling had resolved, and he had "gross vision in all visual fields," meaning no vision loss.  Doc. 46-3 at 18.  Dr. Bisseck's examination does suggest Plaintiff's complaints of pain were legitimate: "Extraocular muscles are functional with limitation of the medial rectus left associated with pain with forced

movement." Id.  But the exam does not suggest Plaintiff's condition got any worse, nor does Dr.

Bisseck's report from the surgery indicate worsened condition.  Id. at 21–28.  Regarding the

reason for the delay in receiving the surgery, Defendants testify the scheduling for outpatient

surgery was not their responsibility.  Indeed, Plaintiff states during a phone call his transfer to

federal prison was "probably because this takes a specialist to do this."  Doc. 48-5 (audio

recording, 4:05–4:32); Doc. 51-1.  Therefore, Plaintiff's contemporaneous view appears to be

that the surgery was delayed because a specialist was needed, not delay by Defendants.  Each

Goebert consideration cuts in the Defendants' favor, and the evidence supports Defendants' lack

of subjective awareness of Plaintiff's risk of harm due to delay in receiving surgery.  Thus, there

is no genuine dispute of material fact as to this element, and Defendants are entitled to summary

judgment on this aspect of Plaintiff's claims.

Likewise, the Court finds the evidence does not support Plaintiff's assertion that the delay

in scheduling surgery caused his injuries to deteriorate, become more permanent, or become life-

threatening.  Plaintiff contends his November 2015 operation took longer and required additional

measures because of the four-month wait for surgery.  But Plaintiff offers no evidence

supporting this contention.  The record shows Dr. Bisseck spent considerable time in surgery to

dissect herniated soft tissue.  Doc. 46-3 at 16, 26.  But the herniated tissue dissected during the

November surgery was identified in the July 2015 CT scan.  Doc. 46-3 at 15–16.  And nothing in

Dr. Bisseck's record shows the herniated tissue became worse or more complicated due to the

intervening time period.  Id. at 18–28.  In the end, Plaintiff's surgery was a success and

proceeded without complications.  Doc. 46-7 at 4.  Immediately after surgery, Plaintiff's gross

vision was reported intact and he did not experience double vision.  Doc. 46-7 at 6; Doc. 46-3 at

26–27.  His follow-up visit with Dr. Bisseck shows Plaintiff had no difficulty with gross vision,

no complaints of pain, denied excess tearing, sensation returned to his face, and he denied blurry

vision, double vision, and dizziness.  Doc. 46-3 at 28.

 Plaintiff further contends two years later, Dr. Wold determined Plaintiff's epiphora was

the result of the delay in receiving surgery for his orbital fracture.  Doc. 53 at 11.  However, Dr.

Wold actually writes in her report, "It sounds like he has epiphora secondary to lacrimal

obstruction.  He could have this as a result from the incision to fix his orbital floor it is

impossible to tell."  Doc. 46-8 at 92.  Even as written, Dr. Wold makes no reference to the

amount of time between Plaintiff's injury and eventual surgery, merely that the incision to fix

Plaintiff's orbital floor—which would have occurred whenever Plaintiff had the surgery—could

be a cause but confirms that it is "impossible to tell" if the incision was the cause.  Even if this

statement implies the incision were a possible cause, "[m]ere possibility does not establish

medical causation."  <u>Siharath v. Sandoz Pharm Corp.</u>, 131 F. Supp. 2d 1347, 1360 (N.D. Ga.

2001).

> To survive summary judgment, a plaintiff must show that the delay attributable to
> the defendant's indifference likely caused the plaintiff's injury.  An inmate who
> complains that delay in medical treatment rose to a constitutional violation must
> place verifying medical evidence in the record to establish the detrimental effect
> of delay in medical treatment to succeed.

<u>McDaniels v. Lee</u>, 405 F. App'x 456, 458–59 (11th Cir. 2010); <u>Hill</u>, 40 F.3d at 1187–88.  Here,

Plaintiff cannot show, because the medical evidence does not support, that his surgery needed to

occur sooner than November 2015, nor can Plaintiff show the four-month wait between his

injury and surgery exacerbated his injury.  "That [plaintiff] felt he should have had surgery

earlier than he did is insufficient to support a deliberate indifference claim."  <u>Palazon v. Sec'y for

Dept. of Corr.</u>, 361 F. App'x 88, 89 (11th Cir. 2010).  Even assuming Plaintiff's orbital fracture

is a serious medical need, and also assuming Defendants were subjectively aware of the medical

need and aware of the risk Plaintiff's eye injury could worsen without prompt surgery (and there

is no evidence to support that), Plaintiff has provided the Court with no evidence demonstrating Defendants' alleged deliberate indifference exacerbated his injury, which is to say Plaintiff cannot prove causation.  As the party opposing summary judgment, Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  Scott v. Harris, 550 U.S. 372, 380 (2007).  Plaintiff has failed to do so. Thus, there is no genuine dispute of material fact as to this element, and Defendants are entitled to summary judgment on this aspect of Plaintiff's claims.

Accordingly, the Court should **GRANT** Defendants' Motions for Summary Judgment and **DISMISS** Plaintiff's Amended Complaint.

## III.    Leave to Appeal *in Forma Pauperis*

The Court should also deny Plaintiff leave to appeal *in forma pauperis*.  Though Plaintiff has, of course, not yet filed a notice of appeal, it is proper to address these issues in the Court's order of dismissal.  See Fed. R. App. P. 24(a)(3) (trial court may certify that appeal of party proceeding *in forma pauperis* is not taken in good faith "before or after the notice of appeal is filed").

An appeal cannot be taken *in forma pauperis* if the trial court certifies that the appeal is not taken in good faith.  28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3).  Good faith in this context must be judged by an objective standard.  Busch v. County of Volusia, 189 F.R.D. 687, 691 (M.D. Fla. 1999).  A party does not proceed in good faith when he seeks to advance a frivolous claim or argument.  See Coppedge v. United States, 369 U.S. 438, 445 (1962).  A claim or argument is frivolous when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless.  Neitzke v. Williams, 490 U.S. 319, 327 (1989); Carroll v.

Gross, 984 F.2d 392, 393 (11th Cir. 1993).  An *in forma pauperis* action is frivolous and not brought in good faith if it is "without arguable merit either in law or fact."  Napier v. Preslicka, 314 F.3d 528, 531 (11th Cir. 2002); see also Brown v. United States, Nos. 4:07-cv-085, 40:3-cr-001, 2009 WL 307872, at *1–2 (S.D. Ga. Feb. 9, 2009).

Based on the above analysis of Plaintiff's action, there are no non-frivolous issues to raise on appeal, and an appeal would not be taken in good faith.  Thus, the Court should **DENY** Plaintiff *in forma pauperis* status on appeal.

## CONCLUSION

For the forgoing reasons, I **RECOMMEND** the Court **GRANT** Defendants' Motions for Summary Judgment and **DISMISS** Plaintiff's Complaint.  I **RECOMMEND** the Court **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal and **DENY** Plaintiff *in forma pauperis* status on appeal.  I also **GRANT** Defendant Pope's Motion for Leave to File Documents Under Seal.

The Court instructs any party seeking to object to this Report and Recommendation to file specific written objections within 14 days of the date on which this Report and Recommendation is entered.  Any objections asserting that the Magistrate Judge failed to address any contention raised in the Complaint must also be included.  Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge.  See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985).  A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in

whole or in part, the findings or recommendations made by the Magistrate Judge.  Objections not

meeting the specificity requirement set out above will not be considered by a District Judge.  A

party may not appeal a Magistrate Judge's report and recommendation directly to the United

States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final

judgment entered by or at the direction of a District Judge.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 3rd day of September,

2020.

BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA